UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

IN RE:                                          Case No.: 09-
                                                (Chapter 11)
MICHIGAN WHEEL CORPORATION,
a Delaware corporation,


            Debtor.                    Hon.
_____/

## MOTION TO APPROVE (1) BIDDING PROCEDURES, A BREAK-UP FEE, BID PROTECTION, FORM OF ASSET PURCHASE AGREEMENT AND OTHER MATTERS RELATING TO SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S OPERATING ASSETS; (2) SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S OPERATING ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 105(A), AND 363, AND (3)THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED NONRESIDENTIAL PROPERTY LEASES UNDER 11 U.S.C. § 365 IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS

Pursuant to §§ 105(a), 363, and 365 of Title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure, (the "Bankruptcy Rules"), Michigan Wheel Corporation (the "Debtor"), debtor and debtor-in-possession in this Chapter 11 case, hereby requests that this Court enter orders authorizing and approving (i) bidding procedures, a break-up fee, bid protection, form of asset purchase agreement, and various other matters relating to the Debtor's intended sale of substantially all of its operating assets; (ii) the sale of substantially all of the Debtor's operating assets free and clear of all liens, claims, and encumbrances to Michigan Wheel Operations, LLC ("MW Operations"), subject to higher and better bids; and (iii) the assumption and assignment of certain executory contracts and unexpired nonresidential property leases in connection with the sale contemplated herein. In support of its Motion, the Debtor respectfully represents as follows:

## Jurisdiction

1.      On July 13, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2.      The Debtor continues in possession of its property and manages its business, as a debtor-in-possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No trustee or examiner has been appointed in the Debtor's Chapter 11 case and no committees have been appointed or designated.

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## Factual Background

### A.      General Background.

5.      The Debtor is a manufacturer and distributor of custom-manufactured marine propellers.  The Debtor has over 100 years of experience as the marine propulsion industry leader.  Debtor serves a wide market within the industry, including both the recreational and commercial markets, custom manufacturing propellers ranging from marine inboard and industrial fixed-pitch propellers through aluminum and stainless steel replacement propellers for Outboard and Sterndrive applications.  The Debtor's philosophy of applying both machine and hand operations — each in the areas where it excels — has made the Debtor's propellers the standard in the industry in terms of both efficiency, reliability and innovation.

6.      The Debtor employs approximately 82 people to manufacture, distribute and sell its products at three locations.  The Debtor employs approximately 63 employees at its corporate world headquarters and central manufacturing facility on Buchanan Avenue in Grand

Rapids, Michigan, 13 employees at an industrial castings facility in Waukesha, Wisconsin, and 6 employees located at a sales and distribution facility in England.

7.      Additionally, the Debtor ceased operations in June, 2009 at its leased facility in Charlottetown, Prince Edward Island, Canada, where it previously employed 14 employees at the time it ceased operations.[1]  Debtor has consolidated and relocated its Canadian manufacturing operations to its Michigan facility.  Debtor currently employs 5 people at its Canadian facility for the purpose of winding up operations at this location.

8.      In addition to employing over 60 employees in the Grand Rapids area, the Debtor utilizes approximately 130 suppliers, many of which are located in West Michigan.

**B.      Current Equity and Debt Structure**

9.      The Debtor's equity is held by three individuals.  James W. Robins and Patrick J. Callahan each own forty-seven and one-half percent (47.50%) of the Debtor's issued and outstanding equity, and George Crawford owns the remaining five percent (5.00%) of the outstanding equity interest.

10.      The Debtor estimates that, in the aggregate, it has approximately 481 creditors, including active and retired employees, senior secured debt in the aggregate principal amount of approximately $3,928,118.58, unsecured trade indebtedness of approximately $1,300,000.00, and other unsecured indebtedness.  In addition, the Debtor has an underfunding obligation to its union pension plan of $4,500,000 and a potential withdrawal liability of $2,595,000 to its non-union multiple employer pension plan.

---

[1] While the Debtor is working to complete the liquidation of its assets related to the Canadian facility, that liquidation and winddown of the business operations in Canada were not complete as of the time of this filing. As a result, the Debtor's Canadian counsel is preparing a skeletal form of an insolvency filing under the Canadian Bankruptcy and Insolvency Act, to the extent necessary to provide the necessary authority for the winddown and liquidation of the assets related to the Canadian operations to be administered in this Chapter 11 proceeding.

**C.     The Secured Debt.**

11.     . The secured debt of the Debtor is comprised of a Revolving Line of Credit, a Mortgage Loan and a Term Loan C, as evidenced by the promissory notes and other loan and security documents between Debtor and Bank of America, N.A, as successor by merger to La Salle Bank National Association ("Bank of America"), and are more fully described in the paragraphs below.

12.     As of June 30, 2009, the outstanding principal balance owed to Bank of America by the Debtor under the various loans were as follows:  (a) $2,994,072.40 under the Revolving Credit Facility, (b) $920,000.00 under the Mortgage Loan, and (c) $14,046.18 under Term Loan C.

13.     The Debtor's obligations to Bank of America are secured by a properly perfected first lien position on substantially all of the Debtor's personal property, as well as a first priority mortgage on the Debtor's Grand Rapids, Michigan facility.

**D.     Events Leading to Filing**

14.     While nearly all companies have been negatively impacted by the current recession, the effect on the Debtor has been severe.  The leisure and recreational boating industry has historically comprised a large part of the Debtor's sales.   Tighter consumer spending, combined with dramatically higher fuel costs, has had a substantial negative impact on this portion of the Debtor's business and has caused a substantial strain on cash flows.

15.     The accompanying decline in revenues, combined with an unmanageable level of secured indebtedness when combined with the Debtor's substantial legacy costs and ongoing pension obligations, worsened the Debtor's financial condition and caused the Debtor's management to determine that the company must locate an investor who could provide a reasonable source of working capital.

16.     As a result, in February 2008, the Debtor engaged the services of Mesirow Financial, Inc. to assist it in locating an investor who could provide the Debtor with sufficient working capital to continue operations.  The Debtor then worked with Mesirow to market the Debtor's business to potential suitors.

17.     After Mesirow marketed the Debtor's business for over sixteen (16) months by contacting over ninety (90) potential suitors and evaluating a number of interested parties, the Debtor, in consultation with Mesirow, determined that pursuing an offer to purchase the Debtor's assets by an entity to be formed by the Anderson Group, LLC ("Anderson") was in the best interests of the Debtor and its relevant constituencies.

18.     As a result of liquidity issues, the Debtor has been forced to file this Chapter 11 case in order to (a) protect its going-concern value in order to facilitate the sale of its assets on a going-concern basis to Anderson or the highest bidder and (b) liquidate its remaining assets under Chapter 11 of the Bankruptcy Code.

## PROPOSED SALE OF DEBTOR'S ASSETS

**E.      Overview of Proposed Sale Process**

19.     As stated above, the Debtor has experienced significant financial difficulties.  The Debtor has determined that it is not possible to operate its business profitably under the current market conditions in the industry.  The Debtor has therefore determined, in the exercise of its business judgment, that the best mechanism for maximizing asset value for the benefit of this estate and its creditors is through an expeditious sale of certain real property, accounts receivable, inventory, equipment, contracts and leases (the "Assumed Contracts and Leases"), intangible assets and intellectual property, as well as certain related assets, all as more fully defined in the APA (collectively, the "Purchased Assets") to MW Operations pursuant to

that certain Asset Purchase Agreement dated July 13, 2009 (the "APA")[2], a copy of which is attached to this Motion as Exhibit A and incorporated herein by reference, subject to higher and better bids.

20.    The Debtor's remaining assets, which include (a) any causes of action under Chapter 5 of Title 11 of the United States Code; (b) all cash, cash equivalents, bank deposits or similar cash items of Debtor; (c) all of Debtor's deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets (as defined below); (d) the Excluded Contracts (as defined in the APA); (e) any accounts receivable arising exclusively out of or exclusively in connection with any Excluded Contract or Excluded Asset; (f) all intercompany obligations, liabilities and indebtedness, including any note indebtedness, owed to Debtor by any Affiliates of Debtor; (g) any (i) confidential personnel and medical records pertaining to any Employee (except as provided in Section 2.1(i) of the APA); (ii) other books and records that Debtor is required by Law to retain (including personnel or medical records of its employees) or that Debtor determines are necessary or advisable to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; and (iii) minute books; (h) any claim, right or interest of Debtor in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom; (i) all insurance policies or rights to proceeds thereof relating to the assets, properties, business or operations of Debtor; (j) any rights, claims or causes of action of Debtor against third parties relating to assets, properties, business or operations of Debtor arising out of events occurring on or prior to the Closing Date; (k) any pension plan assets of the Debtor; (l) any equity interests in any subsidiaries of Debtor; and (m) those assets set forth on Schedule 2.2(1) to the APA (collectively with other remaining assets of the Debtor, the

---

[2] Capitalized terms not otherwise defined in this Motion shall have the meaning given to such term in the APA.

"Excluded Assets"), will remain part of the bankruptcy estate and in all likelihood be liquidated in accordance with the Bankruptcy Code and Rules and the further orders of the Court.

21.     Consequently, the Debtor requests authority to sell to MW Operations the Purchased Assets free and clear of liens, claims, and encumbrances. As a preliminary matter, the Debtor requests the entry of an order (the "Sale Procedures Order"), the form of which is attached to this Motion as Exhibit B and incorporated herein by reference, approving (a) the form of the APA and (b) certain bidding procedures (the "Bidding Procedures"), a copy of which is attached to this Motion as Exhibit C and incorporated herein by reference, for the auction of the Purchased Assets.

22.     The Debtor further requests that it be authorized to provide certain bid protections ("Bid Protections") and to pay to MW Operations a break-up fee of $175,000 (the "Break-Up Fee"), which amount shall include all of MW Operations' out-of-pocket expenses incurred by it in connection with the transactions contemplated by the APA, including, without limitation, legal fees incurred by it, in the event MW Operations is not the successful bidder under the Bidding Procedures proposed herein or the Court does not approve the transaction with MW Operations contemplated by the APA.

23.     The Debtor also requests that the Court approve the form of notice to all creditors of the sale (the "Notice of Sale") attached to this Motion as Exhibit D and incorporated herein by reference.

24.     Additionally, the Debtor requests that this Court schedule a hearing on August 14, 2009, at 9:00 a.m. Eastern Time, or as soon thereafter as counsel may be heard (the "Sale Hearing"), to approve the sale of the Purchased Assets to the highest bidder pursuant to the Bidding Procedures.  The debtor requests that the Court enter an order at the Sale Hearing substantially in the form attached to this Motion as Exhibit E and incorporated herein by reference (the "Sale Order") authorizing the Debtor to sell the Purchased Assets free and clear of

all liens, claims, and encumbrances on substantially the same terms and conditions as are set forth in the APA.

**F.      The Asset Purchase Agreement**

25.      The Debtor and MW Operations have reached agreement regarding the terms of the sale of the Purchased Assets to MW Operations.  The principal terms and conditions of the APA may be summarized as follows:

GENERAL TERMS:  MW Operations will purchase the Purchased Assets set forth in Section 2.1 of the APA.  MW Operations is not acquiring the Excluded Assets, which Excluded Assets will remain a part of the bankruptcy estate and be subject to further disposition in accordance with the Bankruptcy Code and Rules and the further orders of the Court.

PURCHASE PRICE:  MW Operations will pay the Debtor $3,750,000 in cash, subject only to those adjustments set forth in Section 3.2 of the APA (together with the book value of the Assumed Liabilities, the "Purchase Price").

ESCROW AMOUNT:  MW Operations will, upon entry of the Sale Procedures Order, deposit $200,000 into escrow pursuant to Section 3.4 of the APA.

REPRESENTATIONS AND WARRANTIES:  Pursuant to the APA, the Debtor and MW Operations will provide standard representations and warranties, including representations and warranties regarding the Debtor's title to the Purchased Assets.

CLOSING CONDITIONS:    The Debtor and MW Operations have agreed to certain conditions to the closing of the sale of the Purchased Assets, including entry by this Court of the Sale Order (the "Bankruptcy Court Approval").

BREAK-UP FEE:  Subject to Bankruptcy Court approval, the Debtor will be obligated to pay to MW Operations the Break-Up Fee of $175,000 in the event MW Operations is not the successful Bidder to acquire the Purchased Assets in the Auction or the Court fails to approve the transaction with MW Operations contemplated by the APA.

**G.      Proposed Bidding Procedures**

26.      In order to insure the highest and best offer for the purchased Assets as a group, the Debtor has developed the Bidding Procedures as a means of allowing competitive

bidding. As set forth more specifically in the Bidding Procedures, in order to participate in the sales process, each potential bidder (a "Potential Bidder") for the Purchased Assets must be determined to be a "Qualified Bidder". Only "Qualified Bidders" will be permitted to participate in the sales process.

27.     To be deemed a Qualified Bidder, the Potential Bidder must deliver to the Debtor not later than 4:00 p.m. Eastern Time on Monday, August 3, 2009, the following: (i) current audited financial statements of the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited financial statements of the equity holder(s) of the Potential Bidders, or such other form of financial disclosure acceptable to the Debtor and demonstrating such Potential Bidder's ability to close a proposed transaction regarding the Purchased Assets; (ii) a preliminary (non-binding) proposal regarding the purchase price range of the bid and the financing of the transaction; and (iii) an executed Confidentiality and Non-Disclosure Agreement in form and substance reasonably acceptable to the Debtor (collectively, the "Potential Bid Package").

28.     After reviewing any Potential Bid Packages, the Debtor will determine who is a "Qualified Bidder" for the Purchased Assets. Under the Bidding Procedures, a Qualified Bidder is a Potential Bidder that delivers the Potential Bid Package to the Debtor, whose financial information demonstrates the financial capability to consummate a sale, and that the Debtor determines is reasonably likely (based on availability of financing, experience, and other considerations) to submit a bona fide offer and to be able to consummate a sale if selected as the successful bidder. MW Operations is automatically deemed a Qualified Bidder based on its willingness to act as stalking horse bidder in connection with the auction for the Purchased Assets and the Debtor's prior determination of MW Operations' financial qualifications.

29.     The Bidding Procedures require Qualified Bidders to deliver a written copy of their bids to the Debtor not later than 4:00 p.m. Eastern Time on August 10, 2009 (the

"Bid Deadline"). The Debtor shall then distribute copies of the bids to (i) counsel for Bank of
America, N.A., the Debtor's pre-petition secured lender, (ii) the United States Trustee, (iii)
counsel for the Creditors' Committee, if appointed, and (iv) counsel for MW Operations; MW
Operations, having already submitted its bid for the Purchased Assets, shall not be required to
submit any additional bid, but shall be permitted to submit an additional bid in response to the
bid of any other Qualified Bidder. The Debtor may extend the bid Deadline once or
successively, but is not obligated to do so. All initial bids by Qualified Bidders other than MW
Operations must also include the following documents (the "Required Bid Documents"):

- A letter stating that the Bidder's offer is irrevocable until thirty (30) days
  after the Sale Hearing.

- An executed copy of an asset purchase agreement in a form substantially
  the same as the APA. Any changes to the APA must be (a) non-material,
  (b) made to and marked on such form of agreement, and (c) agreed to by
  the Debtor. The asset purchase agreement must set forth a bid at least
  $275,000 in excess of the Purchase Price, as defined in the APA, and not
  be subject to any financing or other condition not set forth in the APA.

- A good faith deposit (the "Deposit") in the form of a certified check (or
  other form acceptable to the Debtor in its sole discretion) payable to the
  order of the Debtor (or such other party as the Debtor may designate) in
  the amount of $200,000.

- Written evidence of a commitment for financing or other evidence of
  ability to consummate the proposed transaction satisfactory to the Debtor
  in its sole discretion.

- Written acknowledgment that the bid is not subject to due diligence
  review, board approval, obtaining financing, or the receipt of any non-
  governmental consents

30. After all Qualified Bids have been received, the Debtor intends to conduct
an auction (the "Auction") with respect to the Purchased Assets if a Qualified Bid other than that
of MW Operations has been received. Subject to the Court's approval, the Auction shall take
place the day prior to the Sale Hearing at 10:00 a.m. at the offices of Miller Johnson, 250
Monroe Avenue, N.W., Suite 800, Grand Rapids, Michigan 49503, or such later time or other

place as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids. Only MW Operations and any other Qualified Bidders will be eligible to participate in the Auction. Based upon the terms of the Qualified Bids received, the level of interest expressed as to the Purchased Assets, and such other information as the Debtor determines is relevant, the Debtor will conduct the Auction in the manner it determines will result in the highest or otherwise best offer for the Purchased Assets. If there is not a timely Qualified Bidder other than MW Operations, then MW Operations shall be deemed the Successful Bidder.

31. Upon the Auction's conclusion, the Debtor, in consultation with its advisors and Thomas Czerwinski, as representative of the Debtor's pre-petition senior secured lender, and representatives of the Creditors' Committee, if one has been appointed, shall (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, and (ii) identify the highest and otherwise best offer (the "Successful Bid"). At the Sale Hearing, the Debtor shall present the Successful Bid to the Court for approval.

32. If the Successful Bidder fails to consummate the transactions by the Closing Date, as defined in the proposed purchase agreement, the Debtor shall (i) retain such bidder's earnest money deposit; and (ii) be free to consummate the proposed sale of the Purchased Assets with the next highest and best bidder at the final price bid by such competing bidder at the Auction (or, if that competing bidder is unable to consummate the purchase of the Purchased Assets at that price, the Debtor may consummate the transaction with the next highest and best competing bidder, and so forth) without the need for an additional hearing or order of the Court; provided, the Debtor must have the consent of its pre-petition secured lender.

**H.    Assumption and Assignment of Executory Contracts; Cure Amounts**

33. As part of the Sale, the Debtor seeks to assume and assign the Assumed Contracts and Leases to the successful bidder pursuant to the terms of the APA, or such other

Purchase Agreement submitted by the successful bidder. With respect to any other contracts and leases of the Debtor, the Debtor will file a motion to assume or reject such contracts and leases at the appropriate point in the Chapter 11 case. The assumption and assignment of the Assumed Contracts and Leases shall be effective upon the Closing of the Sale unless otherwise noticed by the Debtor prior to Closing.

34.     MW Operations or any other Qualified Bidder shall have until August 4, 2009 to designate the Assumed Contracts and Leases that it intends for the Debtor to assume and assign to it pursuant to Section 365 of the Bankruptcy Code. The Debtor shall pay all amounts necessary to cure any monetary defaults under the Assumed Contracts and Leases, as required by Section 365 of the Bankruptcy Code. A schedule of the Debtor's calculation of the amount that the Debtor believes must be paid to cure all defaults under each of their executory contracts and unexpired leases (the "Cure Amounts") will be filed and served upon all parties to the Debtor's executory contracts and unexpired leases no later than eight (8) days prior to the Sale Hearing (the "Cure Amount Deadline").

35.     The Debtor requests that unless a party to an executory contract or unexpired lease files with this Court and serves upon counsel for the Debtor, Thomas P. Sarb, Miller Johnson, 250 Monroe Avenue, N.W., Suite 800, Grand Rapids, Michigan 49503, an objection to its scheduled Cure Amount on or before three (3) days prior to the Sale Hearing (the "Cure Objection Deadline"), such party to an executory contract or unexpired lease shall be forever barred from objecting to the Cure Amount, and from asserting any additional cure or other amounts with respect to its executory contract or unexpired lease, and the Debtor will be entitled to rely solely upon the Cure Amounts. The Debtor further requests that if an objection to a scheduled Cure Amount is filed by a party to an executory contract or unexpired lease, the Court will hear that objection at the Sale Hearing. The Debtor will cooperate with the parties to

the Debtor's executory contracts and unexpired leases to attempt to reconcile any differences in a particular Cure Amount believed to exist prior to the Sale Hearing.

36.    The Cure Amounts scheduled should be deemed to include any such actual or pecuniary losses from an existing default, if any, under the executory contract or unexpired lease. Consequently, the amounts necessary to pay the Cure Amounts as scheduled or determined by this Court will compensate or provide adequate assurance that the appropriate party will be compensated for any such actual or pecuniary loss.

## I.    Break-Up Fee

37.    To induce MW Operations to act as a stalking horse bidder and thereby set a floor price for the Purchased Assets, the Debtor has agreed to pay to MW Operations a Break-Up Fee of $175,000 in the event MW Operations is not the Purchased Assets are sold to a Competing Bidder or if the Court does not approve the transaction with MW Operations contemplated by the APA. MW Operations has expended, and likely will continue to expend, considerable time, money and attention in pursuit of this sale and have engaged in arm's length, good faith negotiations with the Debtor. The APA is a product of those negotiations and benefits the estate by providing a floor price for the Purchased Assets and a form of agreement to be used in negotiations with Potential Bidders.

38.    The Debtor's obligation to pay the Break-Up Fee arises under Article VII of the APA. MW Operations' right to receive payment of the Break-Up Fee shall be treated as a superpriority administrative expense claim under Sections 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, and to the rights of any successor trustee or any creditor, in the Chapter 11 case, or any subsequent proceedings under the Bankruptcy Code. Bank of America, N.A. agrees that MW

Operations right to receive the Break-Up Fee shall, in addition, at all times be senior in all respects to the rights of Bank of America, N.A. in and to any property of the Debtor or its estate, and consents to the payment of the Break-Up Fee as a senior charge against such property. The Debtor's Break-Up Fee obligation survives termination of the APA.

39.    The Break-Up Fee was a material inducement for, and a condition to, MW Operations' entry into the APA. The Debtor believes it is reasonable in light of the comparative size of the proposed transaction and the fact that MW Operations' efforts and due diligence have established a floor price and increased the opportunity for this estate to receive the highest and otherwise best price for the Purchased Assets.

**J.    Notice of Sale**

40.    Within two (2) business days after entry of the Sales Procedures Order, the Debtor will serve the Notice of Sale on all of its known creditors by first class United States mail, postage prepaid, and also serve the Notice of Sale and the Bidding Procedures by first class, United States mail, postage prepaid, upon (i) Bank of America, N.A., the Debtor's pre-petition secured lender, and its counsel, and all other entities known to have asserted any lien, claim or encumbrance in or upon the Purchased Assets; (ii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested herein; (iii) counsel for any committee appointed in this case or (a) if no counsel is employed, the committee members or (b) until a committee of unsecured creditors is appointed, the twenty (20) largest unsecured creditors as disclosed on the Debtor's schedule filed pursuant to Bankruptcy Rule 1007(d); (iv) the United States Trustee, the United States Attorney's Office, and the Internal Revenue Service; (v) counsel for MW Operations; (vi) all parties requesting notice pursuant to Bankruptcy Rule 2002; and (vii) all parties known to the Debtor to have expressed an interest in acquiring the Purchased Assets and other potential purchasers.

## APPLICABLE LEGAL AUTHORITY

**K.    Sales Outside the Ordinary Course of Business**

41.    Section 363 of the Bankruptcy Code provides that the Debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." See 11 U.S.C. §363(b).  To approve the use, sale or lease of property outside the ordinary course of business, this Court need only determine that the Debtor's decision is supported by "some articulated business justification." *See, e.g. Stephens Ind., Inc. v. McClung,* 789 F.2d 386, 389-90 (6th Cir. 1986); *Fulton State Bank v. Schipper,* 933 F.2d 513, 515 (7th Cir. 1991); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F2d 1063, 1070 (2d Cir. 1983); *see also In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 145-47 (3d Cir. 1986); *In re Telesphere Communications, Inc.,* 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 175-76 (D.Del. 1991).

42.    Once the debtor articulates a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company. *In re S.N.A. Nut Company,* 186 B.R. 98 (Bankr. N.D. Ill. 1995); *In re Integrated Resources. Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.,* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

43.    Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. *See Summit Land Co. v. Allen (In re Summit Land Co.),* 13 B.R. 310, 315 (Bankr. D. Utah 1981).  Accordingly, this Court should grant the relief requested in this Motion if the Debtor demonstrates a sound business justification therefore. *See Stephens Ind., Inc.,* 789 F.2d at 389-90; Schipper, 933 F.2d at 515; *In re Lionel Corp.,* 722 F.2d at 1071; *In re Delaware Hudson Ry. Co.,* 124 B.R. 169 at 179.

44.     While the holding of *Stephens Industries* merely requires articulation of a sound business justification for a sale outside the ordinary course of business, other courts have offered additional guidance by citing various factors that they consider in determining whether a sound business justification exists. These factors include: (i) whether a sound business reason exists for the proposed transaction; (ii) whether adequate consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided. *See Abbotts Dairies of Pa., Inc.*, 788 F.2d 143; *Plabell Rubber Prods., Inc.*, 149 B.R. 475, 479 (Bankr. N.D. Ohio 1992) (citing *In re Titusville Country Club*, 128 B.R. 396 (Bankr. W.D. Pa. 1991)).

45.     The Debtor has a sound business justification for selling the Purchased Assets at this time, namely that it will be unable in its current structure to operate profitably in the future due to market conditions in its industry and the lack of the financial resources and access to capital necessary to fund its remaining operations for a prolonged period. Further, the status of the Debtor's cash or other liquid assets necessary to operate in business on a going concern basis has left the Debtor with a small window of opportunity to maximize the value of its assets through an orderly sale process involving competitive bidding.

46.     Additionally, the terms of the sale of the Purchased Assets that the Debtor has reached with MW Operations were proposed and negotiated in good faith, the consideration proposed to be paid by MW Operations is adequate and reasonable under the circumstances and the Debtor proposes to provide reasonable notice of the proposed sale under the Bidding Procedures. For these reasons, the Debtor has determined, in the exercise of its business judgment, that the most viable option for maximizing the value of the estate is through a sale of the Purchased Assets in the manner and in the time frame set forth in the Bidding Procedures. The Debtor's request for approval to sell the Purchased Assets in accordance with the Bidding Procedures should be allowed accordingly.

**L.    Bid Protection and Break-Up Fee**

47.    In order to induce MW Operations to spend the time, energy, and resources necessary to submit an offer that the Debtor can use as a minimum or stalking horse bid at the auction, the Debtor requests authority to offer MW Operations the Bid Protection in the form of a minimum $275,000 bid in excess of the Purchase Price, and a minimum bid increment of $50,000 thereafter.  The Debtor believes that a compelling need exists to authorize the Bid Protection in order to induce MW Operations to submit the first bid for the Purchased Assets within the time frame mandated by the Debtor's business circumstances.  Moreover, the Debtor believes that the proposed Bid Protection will benefit the estate by providing an incentive to MW Operations to expend the resources necessary to consummate the APA.  Finally, the Bid Protection will prevent the inefficiencies and delays of bidding in small increments that do not provide benefit to this bankruptcy estate.

48.    The Debtor has also agreed to provide MW Operations with a Break-Up Fee under certain circumstances.  Break-up fees, such as those included in the APA, are "an incentive payment to a prospective purchaser with which a company fails to consummate a transaction."  *In re S.N.A. Nut Company,* 186 B.R. at 101.  "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers.'"  *Id.*; *see also In re 995 Fifth Ave. Associates, L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking ").

49.    In the bankruptcy context, the test for determining whether a proposed break-up fee should be approved is whether it is in the best interests of the estate.  *Id.* at 140; *see also In re America West Airlines, Inc.,* 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Industries, Inc.,* 140 B.R. 191 (Bankr. N.D. Ohio 1992).  In particular, there must be compelling

circumstances "which clearly indicate that payment of the fee would be in the best interests of the estate." *S.N.A. Nut Company,* 186 B.R. at 105.

50.     The Debtor believes that the Break-Up Fee satisfies this standard. The primary circumstance compelling allowance of the Break-Up Fee is to entice offers for the Purchased Assets so that a transaction can be consummated as quickly as possible..

51.     The Debtor's ability to offer the Bid Protection and Break-Up Fee enables the Debtor to ensure the sale of the Purchased Assets to contractually committed bidders at prices it believes to be fair, while providing the Debtor with the potential of even greater benefit to its estate through higher bids. The Bid Protection and Break-Up Fee should be approved accordingly.

## M.     Sales Free and Clear of Liens, Claims and Encumbrances

52.     Under § 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, or encumbrance in such property if, among other things:

    (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    (2)     *such entity consents;*

    (3)     such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

    (4)     such interest is in bona fide dispute; or

    (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

53.     Because Section 363(f) is drafted in the disjunctive, the Debtor's satisfaction of any one of its five requirements will be sufficient to permit the sale of the Purchased Assets free and clear of all liens, claims, and encumbrances. *See Mich. Empl. Sec.*

*Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. Mich. 1991). The Debtor believes that the primary entity holding a lien on the Purchased Assets is Bank of America, N.A., the Debtor's pre-petition secured lender (the "Secured Lender"). The Secured Lender has supported the sale process, and the Debtor is reasonably confident that it will obtain any necessary consent on or before the Sale Hearing and will thereby satisfy the requirements of § 363(f)(2).

54.    Moreover, all holders of interests, including the Secured Lender, can be compelled to accept a money satisfaction of their liens in legal or equitable proceedings in accordance with § 363(f)(5). Such legal or equitable proceedings include proceedings to confirm a plan or reorganization, under which the holder of a lien may be compelled to accept payment in satisfaction of its lien pursuant to 11 U.S.C. § 1129(b)(2)(A).

55.    Indeed, Section 1129(b)(2)(A) of the Bankruptcy Code specifically allows a debtor-in-possession to sell property subject to a lien, free and clear of such lien, if such lien attaches to the net proceeds of the sale, subject to any claims and defenses the debtor may possess with respect thereto. The Debtor proposes that any liens in the Purchased Assets attach to the net proceeds of the proposed sale.

**N.    Good Faith Purchaser Finding and Immediate Effectiveness of Sale Order**

56.    The Successful Bidder should be afforded all protections under 11 U.S.C. § 363(m) as a good faith purchaser. Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) and (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith..." 11 U.S.C. § 363(m).

57.    As discussed above, prior to entering into the APA with MW Operations, Mesirow Financial had been engaged by the Debtor to market the Purchased Assets for a period

of sixteen months.   During that period, Mesirow contacted over ninety (90) prospective purchasers.  Further, upon execution of the APA and the filing of this Chapter 11 case, Mesirow began remarketing the Purchased Assets to those parties already contacted, as well as other interested parties that could be identified.

58.     The APA with MW Operations constitutes an arms' length transaction that was negotiated between unrelated parties.   Additionally, the Bidding Procedures have been designed to create a fair, open and level playing field to ensure that any party interested in acquiring the Purchased Assets by making a competing bid has every opportunity to do so.

59.     Accordingly, the Debtor requests that the party submitting the Successful Bid be determined to have acted in good faith and be entitled to the protections of a good faith purchaser under Section 363(m) of the Bankruptcy Code.

60.     Further, because all parties have acted in good faith during this process and, once a Successful Bidder is identified, it is critical to the going-concern value of the Purchased Assets that the sale be closed expeditiously, the Debtor respectfully requests that any Sale Order entered by the Court approving the sale to the Successful Bidder be immediately effective and any stay arising under Bankruptcy Rule 6004(h) be waived.

**O.    Summary of Events**

      61.    The following chart summarizes the proposed timeline for the sale process

contemplated in the Bid Procedures Order and Sale Order:

| Event | Date | Action Required |
|---|---|---|
| Sale Procedures | 7/27/09 | Court enters Sale Procedures Order |
| Sale Notice Service Deadline | 7/28/09 | Deadline for Debtor to provide notice of sale |
| Potential Bid Package Deadline | 8/3/09 | Deadline to submit materials required to qualify as bidder |
| Assumed Contract Designation Date | 8/4/09 | Deadline for MW Operations and Potential Bidders to designate the Assumed Contracts and Leases for the Debtor to assume and assign |
| Cure Amount Deadline | 8/5/09 | Deadline for Debtor to file Cure Amount Schedule |
| Competing Bid Deadline | 8/10/09 | Deadline to submit Required Bid Documents/Deposit |
| Assumed Contract/ Leases and Cure Objection Deadline | 8/11/09 | Deadline for a party to executory contract to file objection to either Cure Amount or assumption of contract/lease |
| Sale Date | 8/13/09 | Auction Sale held at offices of Debtor's counsel |
| Sale Hearing | 8/14/09 | Court Approves Sale |
| Closing Date | 8/17/09 | Sale Closes |

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter orders substantially in the forms annexed hereto:  (i) approving the Bidding Procedures, a Break-Up Fee, Bid Protection, the form of the APA, and various other matters relating to the sale of the Purchased Assets; (ii) authorizing the Debtor's sale of the Purchased Assets free and clear of liens, claims and encumbrances to MW Operations subject to higher and better bids; and (iii) for such other and further relief as the Court deems just and proper.

MILLER JOHNSON
Proposed Attorneys for Debtor

Dated: July 13, 2009        By  /s/ Thomas P. Sarb
                            Thomas P. Sarb (P-27520)
                            Robert D. Wolford (P-62595)
                            John T. Piggins (P34495)
                            Business Address:
                                250 Monroe Avenue, N.W., Suite 800
                                PO Box 306
                                Grand Rapids, Michigan  49501-0306
                            Telephone:  (616) 831-1700